Good morning, Your Honor. May it please the Court, my name is Mike Fykes. I represent Hoffmann-LaRoche in this case, along with Tony Martin. We are requesting this Court direct judgment be entered in favor of Hoffmann-LaRoche on the claim of intentional infliction of emotional distress, because the conduct that was the subject of this lawsuit is not even close to that very small slice of human behavior that meets the standard of liability in an intentional infliction claim of outrageous conduct, which, as the Court well knows, is conduct that is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community. Doing so in this case will not deny a recovery to Mr. Dossat or his estate now. He and his attorneys have also already been paid over $300,000 with the award of the judgment on his retaliation claim. The cause of action for intentional infliction of emotional distress first appeared in form in 1946, when the ALI restatement of torts first incorporated it into that body. It was adopted in 1981 by the Supreme Court of Nevada. And like most states, Nevada has looked closely to the ALI for guidance in filling out its jurisprudence in this area. I think it's important to look at the most recent restatement of torts, Section 46, which has now been fully adopted, for what it says about ALI, because it's clear that the state of Nevada looks closely to it for guidance. And some of the things they note about this particular tort is that, first, it is a catch-all that would permit recovery in that narrow instance when an actor's conduct reaches this outrageous standard, but an existing tort claim is unavailable. The ALI says it is one that can easily, but often inappropriately, be added as a supplement to another cause of action in which the grapplement is another tort or statutory violation, certainly our situation in this case. They also are concerned that because so many appropriate legal acts can and, in fact, do cause emotional harm, that without some guidance this is a tort that could be too expensive. And one of the specific examples that the ALI gives is termination of an employee, an often appropriate legal act almost certain to cause emotional distress. Yes. But, of course, we do not have here a mere termination. And if this were merely a termination, you'd be right. That is correct, Your Honor. It is our view that this is a case which there was less than termination. He was never terminated. He ultimately went out on disability. Well, then termination is off the table. So we're not talking about termination. We're talking about the conduct to which I previously referred. Yes, sir. And our view of that conduct, and we think it goes to the central, is that the conduct in question is for the most part what we would call and what other courts in Nevada have called personnel management activity. That is, those steps leading up to termination, but falling far short of it. You know, Mr. Holloway had an interesting style for his personnel management. I will say it that way. Your Honor, I would say that in the courtroom where it is not the workplace, he did not come across as a particularly warm and fuzzy manager, but there are lots of non-warm and fuzzy managers in the world. And I don't think that the intent of intentional infliction is to make for non-stern managers. And it's the law.   Kagan. And I think you know, one thing, I hear your argument, but then you have to go back and look at the trial. And I take it that you agree that the jury instruction on intentional infliction was appropriate. We're not challenging that, Your Honor. Right. And it seemed to me, if you look at where the trial ended, at the closing argument, everything is devoted to everything but intentional infliction. And here's what is said in closing argument, you may recall, on intentional infliction. It comes at the very end and it's very short. It says, on intentional infliction, the Court has said you must find intentional infliction of emotional distress, you must find that it was the intent. In other words, you must get into Mr. Holloway and Mr. George and Ms. Cone's mind and find they intended to inflict emotional harm. And that's what the jury was told in conjunction with the jury instruction. And then, of course, there's a large number that comes out of it. And you know, you said he wasn't particularly warm and fuzzy. We aren't there, but we can read what was almost a throwaway argument on intentional infliction. And the jury was there. They heard the people. They evaluated their credibility. They evaluated, basically, as you said, they got into the mind. And it seems like we'd be hard-pressed in light of how this went down to say, well, we have to say as a matter of law, just ignore all that? Yes, Your Honor, I think you do. I think because this should never have been submitted to the jury. Juries are not. They have different frames of mind. And the case law, I believe, and I believe the intent of the ALI is that we do not get to the jury but in the most rare cases in intentional infliction, emotional distress cases, that this should be a very rare time when that becomes a jury question. In fact, they point out in the ALI comment that there is, for example, a lot of deference traditionally given to whether we submit a negligence case. It would be almost the same. But was your thought that because you thought it should be dismissed as a matter of law, you would just mention it in passing to the jury? I mean, it's a major issue in the case, wasn't it? It certainly turned out to be a major issue in the case, Your Honor. Trying a case where intentional infliction of emotional distress is still in the case at the end is a very difficult task for the trial lawyer. And my judgment, as it turned out, perhaps was not, I perhaps should have argued it more forcefully, but the real point is that the considerations of a jury are much different in considerations of a jurist. Right. Because they're countervailing. But also, at this stage, we have to look for substantial evidence. We operate under a deference standard. We're not going to retry the case for you. And I'm not asking that to the jury.  But I mean, when you say as a general matter from your perception that these cases should rarely go to the jury, in fact, they go to the jury all the time. Not that often, Your Honor. Well, we see a lot of cases from a lot of States, and almost this exists in almost every State, this intentional infliction. We see a lot of them go to the jury. It does, Your Honor. But I think in the State. Let me add one thing so you can respond more fully to both of those, which is each State's jurisprudence is slightly different on the tort. So can you help us with Nevada law and tell us where, outside of the general citation of the restatement, that Nevada has taken the approach that you're suggesting? I can, Your Honor, and I will. This is a case where these are very fact-specific cases. There's no question. And so there are cases that can be called to side on almost anything. But if you step back and try to look at a survey of Nevada law, both from the district courts, where a large body of Nevada law comes, and from the State Supreme Court, it appears to us that there is this body of law that does say personnel management activity, which are those steps that are in question here, less than termination, alone is not sufficient. Certainly the case law termination alone is not sufficient. In every case where there has been a positive holding for intentional infliction of emotional distress, there has been what I would call a plus factor. And they generally fall into three categories. One is where there was physical harm threatened to the plaintiff. Second is where we have a historically category that has been subject to race and gender discrimination. Sexual harassment cases, for example, are often submitted on the grounds of unintentional infliction, and sexual harassment as well. So are racially tinged, outbursts, are often submitted. Well, let me ask you more specifically about Nevada law, because all the categories you cite are definitely true. I mean, that's – those are cases at the margin, for sure. But then I'm looking at, for example, Dillard, and I think we are really guided by the Nevada Supreme Court, not the Federal Court interpreting Nevada law. I mean, this is the – right out of the mouths of the Nevada Supreme Court. And in Dillard, they basically say, okay, number one, you can have this tort in the employment context. So we all agree. I think you and the panel agree on that. And then they said there was substantial evidence to support. And this was a deal where she – this refusal to put this individual back in the area sales manager position occurred, and there was no racial slur or, you know, any kind of protected category problem or anything. It was – it was, as the Court says above, having to do with employment termination. So I guess I'm having some trouble squaring what – you know, from the outside I might view this as a pretty much a garden-variety employment case. The Nevada Supreme Court says it's okay to have this tort. So would you – would you elaborate on that? I would, Your Honor. The Dillard case, I think, is a prime – actually has, I think, two of the three what I would call plus categories. The first is physical harm. She was actually ordered back to work by her supervisor when she had not been released by her doctor after hurting her back at the work. And so there was a risk that the employer had attempted to physically harm her. So that would be one category. Okay. But the third category I had not yet reached, Your Honor, was public humiliation. And that is clearly a plus factor that is not present in our circumstances. So when the finger-triggering episode occurred in public, that was not public humiliation? It was not in public. All of the people – the record is clear that the backs of the people were in – were turned. It was in public. They may not have seen it. That is correct. And – and – So it was not a jury question? No, Your Honor. That – if the single fact of walking by and making that gesture is intentional infliction of emotional distress, I think that throws out the whole body of Nevada law that says it is limited to the most rare of circumstances. And in that case, what Mr. Dossett testified to was that his thought was, that means I'm about to be fired. So I think the Beckwith case is important, Your Honor. But I think it is clearly distinguishable from our facts because it has two of the plus categories. There was public humiliation in two separate ways in Dillard. First, the person was reduced from a sales manager position all the way down to the lowest sales position after she had held this position for 20 years. Nothing comparable in our case. Secondly, she was told to leave a meeting that she had attended regularly for 20 years. Remind us how long he had been with the company. He had been with the company for about 17 or 18 years. So maybe a couple of years short of 20. Yes. He was somewhat short of 20. Your Honors, I would reserve the balance of my time. Thank you, counsel. Rebuttal. Good morning, Your Honor. May it please the Court. A little bit of background is in order. I represent Randy Dossett and his estate. Claudia Dossett is here present in the courtroom. In 2006, when Randy Dossett worked for Hoffman LaRoche, he was at the top of his game. He graduated from the University of Toledo. He got an MBA in 1990. He was married for 40 years to his high school sweetheart. He was a division sales manager, and he had a very successful career. In a span of a few short years, his doctor would be testifying on the stand that this was now a changed man, a broken man, a shell of the man that he used to be. And that's what the jury heard. And the judge in this case made the proper decision. He listened to the arguments on part of opposing counsels six times. This is the sixth time that I've heard the same arguments that IAED should never have been submitted to the jury. But I think Your Honor made a significant point in looking to the jury verdict. There's a critical point here that it is not disputed that the actions of the defendant in this case were intentional. There's no dispute. The jury verdict says, did the defendant intentionally inflict emotional distress upon Randy Dossett? The answer is yes, and that's not disputed in the briefs. Were the acts of the defendant approximate cause of any of the damages sustained by Randy Dossett?  Why does this matter? Under intentional infliction of emotional distress in Nevada law, there's three elements that you must be proven, and this is in Dillard. And the judge, Senior Judge Dossett, properly applied this. First, extreme and outrageous conduct with either the intention or reckless disregard for causing emotional distress. Second, the plaintiff's having suffered severe emotional distress. That's not in dispute here. My client, Randy Dossett, suffered extreme emotional distress. That's not part of the pleadings. Number three, were the acts of the defendants the actual approximate cause? Yes, they were. The jury verdict says so, and they do not dispute it. Kennedy. Could you please review the evidence that supports the verdict, not in the sense of intentionality, because I do think that's off the table, what Mr. Holloway did, he did, he intended to do. But the evidence that supports the conclusion that the behavior was extreme and outrageous. Sure, Your Honor. The testimony at time of trial is peppered with references that Mr. Dossett was terrified of his supervisor. This was as early as December of 2007. Randy Dossett submitted a complaint, a written complaint, that said, my supervisor is aggressive and I am threatened by him. He repeatedly tells Hoffman LaRoche in his communications that, you know, this guy is out to get me. I'm afraid of him. And what do they do? They put him on a performance improvement plan that is supervised by the very man that Mr. Randy Dossett believes is threatening him, that's aggressive towards him, that talks to him in a demeaning and threatening manner. In fact, Mr. Dossett notified Hoffman LaRoche that this is affecting him. Ultimately, he went out on disability leave and the evidence says it's because of a work-related stress. The doctor testified to that, that he, that everything led up over a period of years, Your Honor. We're not talking about months, but over a period of years of repeated, of repeatedly being subjected to this threatening behavior and aggressive behavior on part of James Holloway. Your Honor's also mentioned the fact that there was a gesture, a hand gesture, that was made in the form of a gun and the trigger was pulled. So, I mean, in the record you have yelling and cursing and the hand gesture. What else do you have? Well, Your Honor. I'm just focusing on the conduct, not on your client's reaction to that. Sure. And the conduct, if we put the handgun gesture into context, although the testimony was that the people's backs were turned, were turned and that they could not see him, the fact is that Randy knew, Mr. Dossett knew, and that James Holloway walked by a roomful of people knowing that at any moment the roomful of people could have seen him. And if Randy felt humiliated internally in front of a roomful of people, that's humiliation, and that doesn't take away from the fact that he was humiliated in front of people. Well, but, you know, one of the difficulties, too, is that almost any employee's situation, the people feel humiliated, mad, irritated, distressed by an adverse employment action. So what I think Mr. Fox is saying, you have to draw the line somewhere between what literally happens in almost any case where they make an adverse condition against you and your employment and one where you would allow a supplemental tort to take hold, and the difficulty here is whether there's enough evidence to push it into that category, and particularly under Nevada law. So it would help also if you can tie it up, if you can, to Nevada law. Sure, Your Honor. Dillard is the seminal case here, and Judge Dawson properly applied the Dillard standards here in looking at this case. Like Dillard, there was a reduction in pay, although the defendant's brief does not recognize that there was a reduction in pay, which is the same as Dillard. This was a long-time employee, just like my client. This was an employee that suffered humiliation. There was no requirement in Dillard that you had to have public humiliation. It wasn't a particular requirement. But Nevada law, it's hard to say that personnel management actions, ordinary personnel management actions would include putting up with an aggressive, threatening, terrifying supervisor who ultimately pulls the gun, pulls the trigger on you at the end of the day. Well, what did he do that was terrifying, specifically? My client testified that what he was terrified is that his demeanor, the way he interacted with my client when they did interact, my client felt that he was very aggressive by saying, I'm not going to take this shit anymore, I'm not going to put up with this. It's hard to say when you're not in that particular situation, but one can imagine by the effect that it had on my client that he was threatened, that this person was aggressive, and I think that that's what the jury saw. But I think that does happen a lot in the workplace. There's no question about it. You have a lot of bosses who yell at their employees, and that doesn't always give rise to a tort. So tell me what takes that out of a normal, although regrettable, workplace environment. That these acts were intentional, and they were done in an environment of retaliation. There's no dispute here that retaliation was an issue. And you prevailed on retaliation, which is not on appeal, so it seems to me you have to take that retaliatory conduct a little bit out of this equation because we're talking about a separate tort. Well, I think retaliation matters to the extent that you're looking at the intent and what was the kind of sinister motive that was underlying all of these actions. Why did they do this? When you're talking about ordinary or routine personal management activity, perhaps you would do it in a neutral way or apply it in a neutral application of policies, not in a way that I'm going to apply this because I want to retaliate against this guy, I want to get this guy because of what he did to me, and I'm going to do it intentionally. So there's a difference there. This is hardly an issue of routine personnel management activity. And also, Dillard is what applies here, and I think that Judge Dawson properly pointed out the similarities between this case and Dillard, and I think Dillard is applicable in this case. You know, at trial, plaintiff did provide his own testimony about what happened, the testimony of his doctor, the change of his behavior and character at the time of defendant's actions, that he was diagnosed with post-traumatic stress disorder and experienced physical symptoms, heart problems, and all of which supported the elements of his IIED claim. This is what Senior Judge Dawson believed that this was sufficient evidence for the jury to find on the IIED claim. There was particular reference made in the footnotes to Judge Dawson's order that based on the evidence presented, which included an allegation that following the first charge, the supervisor made that hand gesture that plaintiff was about to be shot, and that a reasonable jury could have concluded that defendant's So what that means is it's important to go back to the standard, and this was articulated by Judge Dawson. Under the standard, there is not just the defendants have not been able to show that the jury could not have found any other way. Kennedy. Could you help me understand the extent that there's any evidence here that Mr. Holloway's behavior or perhaps the company's behavior might have been motivated by the fact that Mr. Dawson was coming up to a period, if he makes a certain number of years, his pension bumps up? What evidence was there, if any, in front of the jury on that question? I don't believe there were any evidence presented regarding the benefits portion, but Mr. Dawson did believe that because of the actions of Mr. Holloway that he was receiving additional benefits in terms of his eligibility to receive additional pay. So that was and also So as I understood it, that testimony was before the jury, but there was no specific testimony about some amount or change in retirement. Is that correct? There was testimony regarding loss of variable pay. But not in terms of, it wasn't quantified, in other words. It was talked about. Correct. Okay. Also, is there some version of the eggshell head rule buried in intentional affliction of emotional distress? By that I mean, if we have someone who is, for various reasons, vulnerable, does the standard of objective behavior change in terms of what's required because certain objective behavior will affect more vulnerable people more severely? Is there something in Nevada law that tells us that? I'm not aware of anything in Nevada law, but that certainly makes sense, Your Honor, to the extent that IIED is a tort. And as with any tort, you do take the plaintiff as you take them. But in the context of employment law, I think this case does rise to the level of extreme and outrageous. That's what you have to look at, because if you just talk about the eggshell rule, then, you know, the Pandora's box of evils that the defendant talks about might come into play there. So there is no specific Nevada law in terms of the eggshell rule. Okay. Any further questions? No? Thank you for your argument. Thank you. Mr. Rabano. Thank you, Your Honors. If I might just briefly readdress Dillard to emphasize the public humiliation aspect, which is very different from this case. Not only was Ms. Beckwith escorted from a public meeting that she had attended for a long time, but the record reflected that thereafter she was made fun of by coworkers talking about her situation where she had been publicly exited and publicly demoted in such a grand fashion. So it falls squarely within one of those three-plus categories that are not here. I think it's important. The Court was asking for a recitation of the facts, and I think it is important to realize a couple of things. One, Mr. Dossett and Mr. Holloway lived and officed one in California and one in Vegas. They only interacted in person three to six times per year at regional meetings. This is not a daily torment-type situation. And boiled down, the bulk of the problem in this case was two write-ups, which one resulted in a loss of pay, but it was, we're talking $6,000 to $3,000, not massive reductions like a 40 percent reduction that occurred in Dillard. Three favorable reviews, being offered a severance package or a PIP. Those are personnel actions that happen every day, as the Court had noted. Outside those, we have two actions where he raised his voice early on. He continued to work for three years, and the gun gesture. Those are not the sort of facts that should lead a jurist looking at the case, deciding whether it should go to court to say, this is outrageous. I believe that is the test. This also would send a terrible message to employers, because it's clear termination is appropriate and you can — that is not the basis for liability. If you instead keep someone on and try to rehabilitate them, then, as plaintiff's lawyer said in his opening, this was death by a thousand paper cuts. An affirmation of this decision will tell employers that the action they should take is to terminate, not try to rehabilitate, because termination is foolproof against a claim of intentional infliction, but engage in a protected period of trying to rehabilitate and you put yourself at risk. We would ask the Court to direct judgment in favor of Hoffman LaRoche. Thank you, Your Honor. Thank you, counsel. Thank you both for your arguments. The case is heard, will be submitted for decision, and we will be in recess until 11 o'clock. Thank you.
judges: Thomas, McKeown, Fletcher